IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

TONYA SMITH,                          )
                                      )
                Plaintiff,            )
                                      )
        v.                            )       Case No.
                                      )       12-5112-REL-SSA
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
                Defendant.            )

### ORDER REVERSING THE DECISION OF THE COMMISSIONER
### AND REMANDING FOR FURTHER CONSIDERATION

Plaintiff Tonya Smith seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and

XVI of the Social Security Act ("the Act").  Plaintiff argues that the Commissioner erred

in (1) failing to afford appropriate weight and controlling weight to the opinions of Jamie

Zengotita, M.D., and Tabassum Saba, M.D.; (2) failing to assess properly plaintiff's

residual functional capacity with respect to both physical and mental limitations; (3)

failing to find plaintiff's testimony credible; and (4) failing to consider new and material

evidence submitted to the Appeals Council.  I find that the substantial evidence in the

record as a whole does not support the ALJ's decision because the ALJ did not

properly address the opinion of plaintiff's treating physician.  Therefore, the decision of

the Commissioner will be reversed and this case will be remanded for further

consideration.

## I.    BACKGROUND

On May 11, 2009, and May 20, 2009, plaintiff applied for a period of disability and disability insurance benefits and supplemental security income alleging that she had been disabled since January 1, 2006.  Plaintiff's disability stems from manic disorders and fibromyalgia.  Plaintiff's application was denied on August 11, 2009.  On May 17, 2011, a hearing was held before an Administrative Law Judge.  On August 25, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On September 13, 2012, the Appeals Council denied plaintiff's request for review after considering additional evidence.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and

apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Terry Crawford, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1978 through
2010:

| Year | Earnings | Year | Earnings |
|---|---|---|---|
| 1978 | $ 1,422.55 | 1995 | $ 6,742.83 |
| 1979 | 1,247.06 | 1996 | 3,347.51 |
| 1980 | 3,223.02 | 1997 | 3,470.05 |
| 1981 | 5,843.21 | 1998 | 11,356.48 |
| 1982 | 9,992.90 | 1999 | 5,056.03 |
| 1983 | 9,353.14 | 2000 | 4,239.57 |
| 1984 | 2,999.05 | 2001 | 7,130.10 |
| 1985 | 4,745.37 | 2002 | 2,007.09 |
| 1986 | 4,390.11 | 2003 | 6,420.66 |
| 1987 | 3,748.66 | 2004 | 11,182.51 |
| 1988 | 6,843.67 | 2005 | 17,139.68 |
| 1989 | 4,001.82 | 2006 | 2,618.88 |
| 1990 | 3,968.60 | 2007 | 5,449.79 |
| 1991 | 8,672.25 | 2008 | 7,230.00 |

| 1992 | 8,251.24 | 2009 | 0.00 |
| 1993 | 4,603.38 | 2010 | 0.00 |
| 1994 | 9,445.16 | | |

(Tr. at 170).

**Function Report**

In a Function Report dated June 4, 2009, plaintiff described her day as trying to help her daughter around the house by folding laundry and keeping an eye on plaintiff's grandchildren (Tr. at 209). Plaintiff does not have any trouble getting along with others (Tr. at 214).

**B.    SUMMARY OF TESTIMONY**

During the May 17, 2011, hearing, plaintiff testified; and Terry Crawford, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

Plaintiff lives with a man, plaintiff's daughter, her daughter's husband, and her daughter's two children, ages five and seven (Tr. at 39, 63). The man is disabled, and plaintiff takes care of him because his children would not take care of him (Tr. at 63-64). They all live in a house together (Tr. at 58). She has an 11th grade education and earned a GED (Tr. at 40). Plaintiff got divorced in 1988 (Tr. at 61). Her medical records indicate that she had gotten into an argument with her husband who threatened to leave her just before her hospitalization in May 2009 at the Hawthorne Center, but plaintiff was not actually married to the man (Tr. at 62).

In 1997 and 1998 plaintiff was a waitress (Tr. at 40). Her next job included working as a waitress, cook and cashier (Tr. at 40-41). In 2004 and 2005 she worked delivering and picking up saw blades and knives (Tr. at 41). She stopped doing that job because the knives were too heavy to pick up (they weighed between 75 and 150 pounds) (Tr. at 61). In 2006 and 2007 she cooked in a restaurant (Tr. at 41). In 2008 she was self employed taking care of an elderly man (Tr. at 41). That job ended when the man passed away (Tr. at 61). She has looked for work since then but has had no luck finding anything (Tr. at 41). Plaintiff was trying to find another job taking care of someone at night because there was no lifting involved (Tr. at 65). She no longer thinks she would be capable of doing that sort of job because she is in too much pain (Tr. at 65).

Plaintiff is 5' 4 1/2" tall and weighs 160 pounds (Tr. at 41-42). She gained about 20 pounds over a six-month period probably due to her medication (Tr. at 42). Plaintiff is right handed and has a valid driver's license (Tr. at 42). She owns a van (Tr. at 63). She drives, but sometimes her hands and arms will get numb (Tr. at 42). She drives about 50 miles per week (Tr. at 43). The longest trip she took in the past two years was to go to Texas to see her son (Tr. at 43). Plaintiff drove the entire trip (Tr. at 43). Because of stopping for breaks, it took 13 1/2 hours instead of 8 (Tr. at 43).

Plaintiff is covered by Medicaid (Tr. at 40). She began seeing a psychiatrist four or five months before the administrative hearing (Tr. at 43). Before that she participated in counseling at the Clark Center in Monett (Tr. at 44).

Plaintiff was diagnosed with fibromyalgia about nine years ago (Tr. at 44). The fibromyalgia causes plaintiff to have pain in her lower back and in her legs (Tr. at 44). It also causes her arms and hands to go numb (Tr. at 45). Plaintiff has pain in her shoulders which she rates an 8 or 9 on a scale of 1 to 10 (Tr. at 45). Her lower back pain is constant and she rates it an 8 or 9 on a scale of 1 to 10 (Tr. at 45). Her hands go numb 3 or 4 times a week (Tr. at 45). She does not know what causes the numbness, but when it occurs she has to stop what she is doing, such as driving or writing (Tr. at 46). It takes about two hours for the numbness to go away completely (Tr. at 46). During her trip to Texas she could drive for about two hours and then would have to stop and rest her hands for about an hour (Tr. at 46). Plaintiff drops dishes because of the numbness, but she does not have difficulty with any arm movements (Tr. at 47).

Plaintiff had surgery on her right knee which no longer causes her problems (Tr. at 47). Her left knee now locks up and will not bend (Tr. at 47). It happens about every other week (Tr. at 47). When it locks, plaintiff has to stop and try to exercise it and bend it which takes 30 minutes to an hour (Tr. at 48). The pain in plaintiff's legs is rated as a 7 or 8 on a scale of 1 to 10 (Tr. at 48).

Plaintiff had been taking Percocet for her pain, but recently it was changed to OxyContin (Tr. at 48). Plaintiff had been taking Percocet three times a day as directed by her doctor, and it did not entirely get rid of her pain (Tr. at 49). Plaintiff tries to walk and exercise to help her pain -- she can walk about 100 yards before she has to sit down and rest due to the pain in her legs and back (Tr. at 49).

Plaintiff has COPD for which she uses an inhaler (Tr. at 49). Plaintiff smokes just under a pack of cigarettes per day (Tr. at 49). She used to smoke two packs a day but has tried to cut down (Tr. at 50). Walking sometimes worsens her shortness of breath (Tr. at 50). Humidity and heat also exacerbate her shortness of breath (Tr. at 50). Plaintiff can stand for 15 to 20 minutes before needing to rest (Tr. at 50). She can sit for about an hour before needing to stand up due to back pain (Tr. at 50-51). She can lift about five pounds, but then she has a "fibromyalgia attack" which consists of her left side pulling and her left arm going completely numb (Tr. at 51). Her face "draws down" and she has to take a break (Tr. at 51). "And that's just in carrying in a couple bags of groceries, I can do that." (Tr. at 51).

Plaintiff puts her feet up on an ottoman or a little chair to rest because she is tired and is in pain (Tr. at 51-52). On good days she sits with her feet propped up for about two hours; on bad days she does not do anything and sits, either with her feet propped up or down, all day (Tr. at 52). Plaintiff has bad days two or three times a week (Tr. at 52).

Plaintiff has suffered with depression her entire life (Tr. at 52-53). She tried to commit suicide when she was seven years old (Tr. at 53). The depression got worse after her last job (Tr. at 53). She checked herself into the Hawthorne Center because she thought she was losing her mind -- she wanted to go to sleep and never wake up, she was "ugly, mean, hateful," and her depression now interferes with her ability to work (Tr. at 53-54). She has bad depression days about four or five days per month (Tr. at 54). On those days, she dos not talk to anyone, she sometimes does nothing, and she

has to force herself to get up to use the bathroom (Tr. at 54). She does not get dressed, and she cries for no reason (Tr. at 55). Plaintiff does not have an appetite -- she eats once a day and that is usually a salad (Tr. at 55). On a bad day, she has no energy and her concentration is diminished in that she forgets what she is doing (Tr. at 55).

Since she was discharged from the hospital, she still has days when she wants to lie down and not get back up (Tr. at 55). She does not like to be around a lot of people -- she has to know what is going on around her (Tr. at 56).

On a bad day, plaintiff sits in her chair with her feet up or lies in bed all day (Tr. at 56). She speaks to her grandchildren, but she does not care if she talks to anyone else (Tr. at 56). Plaintiff is being treated for post traumatic stress disorder (Tr. at 57). She feels like she is going to explode, she has nightmares which "make for a bad day" because the nightmare will be on her mind all day (Tr. at 57). She has nightmares a couple times a week and they interfere with her ability to concentrate (Tr. at 57). They are starting to get better now that she has been put on Citalopram (antidepressant) (Tr. at 57-58).

Plaintiff's only medications are Citalopram and OxyContin (narcotic) (Tr. at 58).

Plaintiff does some housework but has trouble forgetting what she is doing (Tr. at 58). She does a load of laundry every other day, but her daughter does some as well (Tr. at 64). Plaintiff cooks about once or twice a week (Tr. at 64). On a bad depression day, she does not do anything (Tr. at 59). She can pick up sticks so the yard can be mowed, and she does that for five or ten minutes at a time (Tr. at 59). Plaintiff does

very little grocery shopping -- she forgets what she needs unless she makes a list (Tr. at 59). Plaintiff can carry in two or three bags of groceries at a time (Tr. at 59). Her daughter and grandchildren normally carry the groceries in if plaintiff has an attack on her left side (Tr. at 59). Plaintiff fishes for 30 to 60 minutes at a time a couple times a week (Tr. at 60). She goes to the creek and drops her line in and the current carries it out (Tr. at 60). Plaintiff drives to the water which is about three miles from her house (Tr. at 63). Her gentleman friend usually goes with her (Tr. at 63).

**2.    Vocational expert testimony.**

Vocational expert Terry Crawford testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes Cashier II, light unskilled work performed at the medium level, DOT 211.462-010; Waitress, light semi-skilled work performed at the medium level, DOT 311.477-030; Delivery Driver, medium semi-skilled work performed at the very heavy level, DOT 292.353-010; and Home Attendant, medium semi-skilled work performed at the heavy level, DOT 354.377-014 (Tr. at 65-66).

The first hypothetical involved a person with the limitations described by plaintiff in her testimony (Tr. at 66). Such a person could not work (Tr. at 66).

The second hypothetical involved a person with the limitations described by Dr. Zengotita in a Medical Source Statement - Physical dated October 6, 2010 (found at pages 602-606 of the transcript) (Tr. at 66). Such a person could not work (Tr. at 66).

The third hypothetical involved a person with the limitations described by Dr. Tabassum in a Medical Source Statement - Mental dated April 21, 2011 (found at pages 929-933 of the transcript) (Tr. at 66). Such a person could not work (Tr. at 66).

The fourth hypothetical involved a person who could stand or walk six hours per day; sit for six hours per day; lift 20 pounds occasionally and 10 pounds frequently; could occasionally kneel or crawl; should not work at heights or around hazardous unprotected moving equipment; should avoid extreme dust, fumes, poor ventilation, temperature and humidity; could not handle a high-stress job such as one requiring fast-paced activity or one that involves strict and explicit quotas, deadlines, schedules or unusual changes in the work setting; the person could not sustain a high level of concentration such as sustained precision or sustained attention to detail; the person would be capable of carrying out simple routine repetitive tasks; the person should not have personal interaction with the public or close personal interaction with coworkers (Tr. at 67). The vocational expert testified that such a person could work as a "cleaner housekeeping" which is light unskilled work, DOT 323.687-014, with 400,000 in the country and 7,000 in Missouri, or an office helper, DOT 209.562-010, with 160,000 in the country and 3,200 in Missouri (Tr. at 68). The housekeeping job involves cleaning until the work is finished, it does not require working at a particular pace (Tr. at 69).

The fifth hypothetical was the same as the fourth except the person would be absent from work at least two days per month due to his impairments (Tr. at 68). Such a person could not work (Tr. at 68).

The sixth hypothetical was the same as the fourth except the person would need to take rest breaks away from the job station which would be in excess of one hour of scheduled breaks (Tr. at 68-69). Such a person could not work (Tr. at 69).

## C.    SUMMARY OF MEDICAL RECORDS

Because this opinion focuses on the ALJ's treatment of Dr. Zengotita, plaintiff's treating physician, the following records are all from plaintiff's visits to Dr. Zengotita's office.

On June 12, 2006, plaintiff saw a nurse practitioner in Dr. Zengotita's office (Tr. at 284). Plaintiff reported that Effexor (treats depression and anxiety) made her feel like she was on a speeding train. Plaintiff's mother died a month earlier and plaintiff had not been able to make it to the funeral. She felt she had no closure, had not been sleeping, could not function at work, could not concentrate, was irritable and was crying a lot. She reported lack of motivation, not caring about herself, and she said she had suicidal thoughts when her mother first died. Plaintiff said she lived with her daughter, son, 2 granddaughters, her boyfriend and a friend. Plaintiff had taken Cymbalta (treats depression and fibromyalgia) as directed and she said it made her quiver and shake. She said she had previously tried Elavil, Amitriptyline, Prozac, Zoloft and Effexor -- all antidepressants. Ms. Gardner assessed depression mixed with anxiety, insomnia, and grief. She told plaintiff to discontinue Cymbalta and start Lexapro (antidepressant). Samples were given. She also prescribed Rozerem for insomnia and provided samples. She also recommended grief counseling.

On June 26, 2006, plaintiff saw a nurse practitioner in Dr. Zengotita's office (Tr. at 283). Plaintiff reported having a panic/anxiety attack. She took a friend's Xanax (anti-anxiety) and was still taking Lexapro. She reported having taken one Rozerem and sleeping for 24 hours, so she had only been taking half a pill. Plaintiff took a Xanax for two days and her family noticed a change -- she was not crying as much, she was laughing more, she was not as withdrawn, and she felt more motivated. She was assessed with depression mixed with grief, anxiety, and insomnia. Ms. Gardner prescribed Lexapro, Xanax, and Rozerem.

On August 3, 2006, plaintiff saw a nurse practitioner in Dr. Zengotita's office (Tr. at 282). "Has been working a lot of shifts. Lexapro working wonderful." Plaintiff reported increased panic attacks with the increase in work so she had been taking an extra Xanax. She complained of severe charlie horses which did not improve even with taking three doses of Soma (muscle relaxer) per day. She was assessed with depression mixed with anxiety, insomnia, asthma, fibromyalgia, and muscle spasms. Plaintiff was prescribed Zanaflex (muscle relaxer), was told to increase her Lexapro, and was given asthma medication.

On October 10, 2006, plaintiff saw a nurse practitioner in Dr. Zengotita's office and complained of trouble sleeping and pain in both of her arms (Tr. at 281). She said it hurt to drive and to push a lawn mower or grocery cart. Plaintiff had increased fatigue and pain in her right shoulder. She was assessed with fatigue and bilateral arm paresthesia. X-rays of her cervical spine and lab work were ordered -- all were normal (Tr. at 285-286, 288).

On October 23, 2006, plaintiff saw a nurse practitioner in Dr. Zengotita's office and complained of continued bilateral arm numbness (Tr. at 280). She described tingling and burning and said her palms were itchy. She complained of right shoulder pain. "Flipped eggs for 7 hours yesterday. States her right hand locked up on her yesterday." On exam plaintiff had tenderness along the supraspinous border. She was assessed with shoulder pain, bilateral arm parasthesias, and insomnia. She was told to use bilateral arm splints, get a shoulder x-ray, continue taking Rozerem (for insomnia) and start Lyrica (treats nerve and muscle pain). Plaintiff's shoulder x-ray was normal (Tr. at 287).

On March 2, 2007, plaintiff saw a nurse practitioner in Dr. Zengotita's office for shoulder pain (Tr. at 279). Plaintiff was out of Soma (muscle relaxer). She asked to get back on Xanax (anti-anxiety). "Son in Baghdad. Can't sleep at night. Having nightmares. Her husband[1] was having medical problems which was increasing her stress. She was having anxiety attacks." Plaintiff was taking Lexapro. On exam plaintiff was tender along the trapezius muscles. Plaintiff cried during her physical exam. She was assessed with increased anxiety, insomnia, depression, and muscle spasms. Plaintiff's prescription for Soma was refilled, her prescription for Xanax was increased and she was told to continue using Lexapro.

On April 5, 2007, plaintiff saw Dr. Zengotita for sinus infection symptoms (Tr. at 278). She reported that the Xanax was helping her sleep and her anxiety was doing

---

[1]Plaintiff testified that despite the references in her medical records to her "husband" she has not been married since 1988.

OK.  Xanax was also helping with her nightmares.  Plaintiff continued to have anxiety attacks when watching the news or hearing things about the war, "currently where her son is at."  He continued plaintiff's Lexapro and increased her Xanax.

By a year later, on May 23, 2008, plaintiff had been taken off Xanax and had been prescribed Celexa, an antidepressant, when saw Dr. Zengotita (Tr. at 272). Plaintiff said that she was experiencing feelings on the left side of her body like her skin was falling asleep.  She had gone to the emergency room a few weeks earlier and had a CT scan that was normal.  Plaintiff said that Celexa made her feel "crazy" and that she wanted back on Xanax.  He assessed fibromyalgia and "asthma?".  He indicated he would obtain plaintiff's records from Monett emergency room.  He restarted Xanax (anti-anxiety) and gave her a trial of Lyrica (treats nerve and muscle pain).  He also gave her samples of asthma medications.

On June 30, 2008, plaintiff saw Dr. Zengotita for a follow up on fibromyalgia (Tr. at 270-271).  Since he had restarted her Xanax (anti-anxiety) and prescribed Lyrica (treats nerve and muscle pain) she said she was feeling "wonderful" and had no more anxiety or mood swings.

On September 18, 2008, plaintiff saw Dr. Zengotita for a follow up (Tr. at 262-267, 451-452).  Dr. Zengotita reviewed plaintiff's medications which included Xanax (anti-anxiety) and Soma (muscle relaxer).  Plaintiff continued to complain of tingling in her body and daily headaches, a new symptom.  Plaintiff was observed to be pleasant and cooperative.  She was assessed with fibromyalgia for which she was prescribed

Soma (also called Carisoprodol,[2] a muscle relaxer) and Cymbalta (also called Duloxetine, an antidepressant also used to treat nerve pain). She was also assessed with generalized anxiety disorder and was prescribed Xanax (also called Alprazolam).

On October 17, 2008, plaintiff saw Dr. Zengotita for a follow up on fibromyalgia (Tr. at 258-261, 451). Plaintiff said that her mood had been better on Cymbalta but she had been having a lot of mid-back pain. "Started hurting more in the last three days. States it makes her cry." On exam plaintiff had pain to very light touch throughout her thoracic and lumbar paraspinal muscles. There were muscle spasms in her lower thoracic area. Dr. Zengotita assessed fibromyalgia and back pain. He prescribed Vicodin (narcotic) and told plaintiff to increase her Cymbalta (antidepressant).

On November 3, 2008, plaintiff saw Dr. Zengotita for a follow up on fibromyalgia (Tr. at 254-257, 450). Plaintiff reported that her pain was worse and that Norco (narcotic) was not helping. She was not sleeping because of her pain. On exam plaintiff had pain to light palpation throughout her paraspinal muscle on her neck and thoracic spine. Dr. Zengotita told plaintiff to stop the Norco, start taking Percocet (narcotic), and increase her Cymbalta (antidepressant).

On December 18, 2008, plaintiff saw Dr. Zengotita complaining of a cough (Tr. at 249-253, 449-450). Plaintiff was noted to be a smoker. Plaintiff had wheezes, rales and tenderness. She was assessed with acute bronchitis. Dr. Zengotita prescribed antibiotics and an inhaler.

---

[2]In some records the generic name is used and in others the brand name is used. For easier clarification, I have used the brand names throughout this order.

On April 22, 2009, plaintiff saw Amy Gardner, a nurse practitioner in Dr. Zengotita's office (Tr. at 447-448, 541-545). Plaintiff reported increased back pain. "She is currently taking Percocet [narcotic] and she does not feel like it is helping. She has tried Lyrica [treats fibromyalgia] but it makes her extremely agitated and she sweats." Plaintiff also reported high blood pressure readings and lower leg swelling. She said she was not sleeping well, that she would go two to three days without sleep and felt "really up" and would clean. Then she would come down hard and feel very depressed and sleep all day. "She stopped the Cymbalta at the first of the month. She felt it made her depressed." Plaintiff was observed to be in mild to moderate distress. Plaintiff had tenderness in her back and shoulder. She was assessed with fibromyalgia, manic/depressive episodes, hypertension, and upper back muscle tension. She was started on Depakote (an anticonvulsant used to treat mood disorders), hydrochlorothiazide (for hypertension), and lidocaine patches for her upper back. She was counseled on stretching for her fibromyalgia.

On April 28, 2009, plaintiff saw Dr. Zengotita for a follow up on fibromyalgia (Tr. at 446-447, 537-539). Her pain was not better with Percocet (narcotic). Plaintiff had recently been started on Depakote and Neurontin (also called Gabapentin, treats nerve pain). She reported that had improved her sleep, and her husband thought her mood swings were slightly better. Plaintiff did not think she was much better. The lidocaine patches had been helping with her right upper back pain. On exam she had pain to light palpation through her paraspinal muscle on her neck and thoracic spine. She was

assessed with fibromyalgia and back pain.  Dr. Zengotita increased her Percocet and told her to keep taking the Depakote and Neurontin.

On May 12, 2009, plaintiff saw Amanda Crim, a physician's assistant in Dr. Zengotita's office (Tr. at 445-446, 532-536).  Five days earlier a tornado hit close to plaintiff's home.  She was running through the house and tripped and fell on her hand which had turned blue.  She was assessed with contusion of the hand and told to use ice and ibuprofen.

On May 19, 2009, plaintiff saw Amy Gardner, a nurse practitioner in Dr. Zengotita's office (Tr. at 445, 528-531).  "Pt is here today with her husband. She is crying  uncontrollably and her husband talks most of the visit. Tonya has been having severe mood swings with periods of time of being up for long stretches at times 3 days in a row. Per the husband she had not showered for 2 weeks at this point.  She has anger outbursts. . . .  She does have pre-occupation about death."  Ms. Gardner assessed manic-depressive disorder and severe major depression without psychotic features.  She counseled plaintiff and her boyfriend regarding the importance of plaintiff going to her psychology appointment for further evaluation regarding her mood.

On May 27, 2009, plaintiff saw Dr. Zengotita for a follow up from her visit at the Hawthorne Center (Tr. at 444, 524-527).  "She lost it at home, after an argument with her husband. He threaten[ed] to leave her. She went an[d] saw a counselor, who diagnosed her with Bipolar and recommended a hospital admission.  At the hospital, her Depakote was increased . . .  Now she feels zombie[d] out, and is having trouble remembering things and keeping track of time.  She still feels anxious.  She feels

19

dyspneic [as if she cannot catch her breath]."  Plaintiff's back continued to hurt.  During the exam plaintiff was noted to be crying and anxious.  She was assessed with bipolar disorder, generalized anxiety disorder, post traumatic stress disorder, and chronic back pain.  He continued her same medications.  "Long visit: discussed about counseling, exercises, and take medicines as prescribed."

On June 11, 2009, plaintiff saw Dr. Zengotita for a follow up (Tr. at 443, 519-523).  Plaintiff reported that she was to begin counseling with Brian Petrovich, Psy.D., in a few days.  Her back continued to hurt.  He had decreased her dosage of Depakote and Neurontin and felt better, her mood was stable and her sleep was improved.  He assessed bipolar disorder, generalized anxiety disorder, post traumatic stress disorder, and chronic back pain.  "Discussed about counseling, exercises, and take medicines as prescribed."

On June 29, 2009, plaintiff saw Dr. Zengotita for an early follow up visit (Tr. at 442-443, 514-518).  "Her daughter had called last Thursday because Tonya was more aggressive, upset.  She had been having nightmares, and they were causing her to be very upset."  Plaintiff stopped her evening Depakote and Neurontin but was taking those medications in the morning.  The nightmares then stopped.  She was feeling better.  Plaintiff had been out of her Xanax for the past nine days.  She met with a psychologist intern earlier that day and plaintiff was working on anger management techniques.  Plaintiff was noted to be pleasant and cooperative.  She was assessed with manic-depressive disorder.  Dr. Zengotita continued plaintiff's Neurontin and

Depakote and told her to try to increase her dose to twice a day in a few weeks. He told her to continue taking Xanax as needed for anxiety.

On July 23, 2009, plaintiff saw Dr. Zengotita for a follow up (Tr. at 441-442, 508-513). Plaintiff said her current medication therapy was working for her. She continued to see her counselor. She complained of cold symptoms. She was assessed with severe major depression without psychotic features, fibromyalgia, and sinus infection. Dr. Zengotita prescribed an antibiotic, Percocet (narcotic), Soma (muscle relaxer), Cymbalta (antidepressant) and Lidocaine patch (treats burning, stabbing pains).

On August 27, 2009, plaintiff saw Dr. Zengotita for a follow up (Tr. at 503-507). "Feels her current therapy is not working for her. Continues to see her counselor. Some days feels good, some days feels like she is in a black hole. Pain is stable." She was assessed with manic depression, fibromyalgia, and hypertension.

On September 22, 2009, plaintiff saw Dr. Zengotita for a follow up (Tr. at 497-502). "She is doing very good. She is sleeping well. Mood is stable. Still going to counseling in Aurora. . . . Pain is an ongoing problem." She was observed to be pleasant and cooperative. She was assessed with severe major depression without psychotic features, fibromyalgia, back pain and manic depression. Dr. Zengotita recommended x-rays of the lower back and neck and he refilled her medications.

On October 20, 2009, plaintiff saw Amy Gardner, a nurse practitioner in Dr. Zengotita's office (Tr. at 492-496). She said that for the past two weeks her Seroquel (antipsychotic) and Xanax (anti-anxiety) were not helping. She was not able to sleep, she was feeling paranoid, and she was feeling like she did before she was hospitalized

for her mental status.  Plaintiff was feeling significant stress over recommendations by her psychiatrist regarding facing past situations.  Plaintiff was observed to be crying and agitated during this appointment.  She was assessed with sever major depression, manic depression, and generalized anxiety disorder.  Her dose of Seroquel and her dose of Xanax were increased.  "Daughter will keep the medication hidden and administer it to her for safety purposes."

On October 26, 2009, plaintiff saw Amy Gardner, a nurse practitioner in Dr. Zengotita's office, for a follow up "to her mood" (Tr. at 487-491).  "She is doing much better since her Seroquel was increased.  She is not crying and having emotional lability like she was having.  No suicidal or homicidal ideations. She is sleeping, which has improved for her since her last visit."

On November 23, 2009, plaintiff saw Michelle Homesley, a registered nurse in Dr. Zengotita's office, for a follow up on blood pressure (Tr. at 482-486).  Plaintiff reported feeling well with good appetite. She said she had been sleeping fairly well but had a nightmare "the other night."  Plaintiff reported continuing anxiety.  On exam, Ms. Homesley noted, "Thought processes are intact, interacts well with staff."  She assessed manic depression.

On December 14, 2009, plaintiff saw Dr. Zengotita complaining of low back pain (Tr. at 474-481).  She had been dealing with this pain for the past six years.  Pain was exacerbated by standing, lifting and twisting, and was getting worse by the day.  Plaintiff was taking Percocet (narcotic) and using Lidocaine patches but said they did not help very much.  Her gait was normal, she had decreased range of motion in her lumbar

spine and palpable tenderness.  She had all fibromyalgia tender points bilaterally.

Patrick's maneuver and straight leg raising were negative.  She had normal strength

and muscle mass in her legs and normal range of motion of all joints.  She had four

positive Waddell's signs.[3]  Her psychological exam was normal, her short-term memory

and higher cognitive functions "appear to be intact."  Plaintiff's lumbar MRI was normal

except for showing mild disk degeneration at L4-L5.  Her cervical MRI was entirely

normal.  Plaintiff continued to report problems sleeping; she no longer had complaints

of depression.  "I have recommended to this patient today that [she] consider a

multidisciplinary approach to pain management. This patient is being referred to our

chronic pain team for consultation with a team of psychologists and physical therapists

specializing in pain management. Further identification of physical and psychological

barriers impairing this patient's function is requested; guidance regarding the

appropriate use of invasive interventions or medications should be considered.  If

treatment is appropriate after this consultation, it may consist of a physical therapy

program with desensitization techniques and attempts to improve conditioning with

instructions and assistance in home therapeutic exercise. Aquatic therapy may serve as

---

[3]In patients with chronic pain, psychological distress may amplify low back symptoms, and may be associated with anatomically "inappropriate" physical signs. The most reproducible of these signs are superficial tenderness, distracted straight leg raising (i.e., discrepancy between seated and supine straight leg raising tests), and the observation of patient overreaction during the physical examination, also known as Waddell's signs.  Other Waddell's signs suggestive of symptom enhancement include nondermatomal distribution of sensory loss, sudden giving way or jerky movements with motor examination, inconsistency in observed spontaneous activity (dressing, getting off table) and formal motor testing, and pain elicited by axial loading (pressing down on top of head, or rotating the body at hips or shoulders). The presence of multiple Waddell's signs may suggest a behavioral component to a patient's pain.

a bridge to more effective daily functioning. The proper use and application of supportive devices including corsets, braces and orthotics will be considered. Psychological techniques including cognitive behavioral therapy, cognitive reformation, identification and treatment of prior trauma, neural feedback and other treatments will be considered to improve this patient's coping skills. She cannot afford to travel for this. She has tried all the fibro[myalgia] drugs."

On December 21, 2009, plaintiff saw Dr. Zengotita for a follow up (Tr. at 461-466). "She is doing very good. She is sleeping well. Mood is stable. Haven't been able to go back to counseling in Aurora. Not suicidal. Pain is an ongoing problem. Been to spine center. Conservative treatment recommended." Plaintiff was observed to be pleasant and cooperative. She was assessed with fibromyalgia, hypertension, generalized anxiety disorder, degenerative disc disease, high cholesterol, and gastritis. He continued her on the same medications and encouraged her to stop smoking.

On March 24, 2010, plaintiff saw Dr. Zengotita for a follow up (Tr. at 454-460). "She is doing very good. She is sleeping well. Got a new bed. It has helped with her pains. Mood is stable, is taking the Seroquel in the afternoon, and it has helped as well. Has not gone to counseling due to financial reasons. Pain is an ongoing problem. Been to spine center. Conservative treatment recommended." Plaintiff was observed to be pleasant and cooperative. She was assessed with fibromyalgia, generalized anxiety disorder, asthma, and hypertension. She was prescribed Soma (muscle relaxer) and encouraged to stop smoking.

On April 13, 2010, plaintiff saw Dr. Zengotita after having fallen down three wet stairs (Tr. at 913-916). She fell on her right hip. X-rays were normal. Plaintiff also complained of "jumping" legs and pain in her left Achilles. Plaintiff was described as pleasant and cooperative. Bruising on her left heel to lower calf were noted but she had full range of motion of her foot and ankle. She was prescribed Mirapex for restless leg syndrome.

On May 13, 2010, plaintiff saw Amanda Winfrey, a nurse practitioner in Dr. Zengotita's office (Tr. at 907-910). Plaintiff said she fell down the stairs a month earlier and was seen in the emergency room. She was told she did not have a fracture. She complained of worsening pain and swelling in her knee and ankle. She was observed to have an antalgic gait (a limp to avoid pain on weight-bearing). She had tenderness over the medial and lateral aspect of the knee and tenderness with passive flexion. She was assessed with right knee pain "rule out ligament injury" and left ankle pain. She was told to rest the injured area as much as practical and was told that physical therapy would be recommended if it did not improve. He scheduled an MRI of the knee and discussed self-stretching exercises.

On August 30, 2010, plaintiff saw Dr. Zengotita (Tr. at 891-905). Plaintiff said her Xanax prescription was not working. "Feel[s] like her whole body is going to explode. Cannot concentrate. Nerves are shot, wanting to cry all the time. Is thinking about the past all the time and thinking about her mother. Not suicidal. Is also back to throwing up every morning." Dr. Zengotita observed that plaintiff appeared anxious and was crying during the appointment. He assessed manic depression, severe major

depression without psychotic features, peptic ulcer disease, malaise and fatigue, nausea with vomiting, hypertension, and chronic gastritis. He increased her Seroquel (antipsychotic), increased her Prilosec (reduces stomach acid), and ordered blood work.

On October 6, 2010, plaintiff saw Dr. Zengotita for a follow up (Tr. at 882-889). "Anxiety thru the day is a bit better with the addition of Seroquel in the am. But still is not sleeping. Is having nightmares. Will sleep [sic] about her mom coming back. She had tried to kill her when she was a child. Will dream her husband has died. Back continues to hurt. Will get stressed out, and her back will hurt to the point it makes her cry. She is not seeing the psychologist any longer, because does not have the money for gas." Dr. Zengotita observed that plaintiff appeared anxious and was crying during the appointment. He assessed manic depression, generalized anxiety disorder, insomnia and fibromyalgia. He increased her Seroquel and referred her to the Clark Center.

That same day Dr. Zengotita completed the Medical Source Statement Physical that is the subject of plaintiff's argument (Tr. at 603-606). He found that plaintiff could lift and carry five pounds frequently and ten pounds occasionally; stand or walk for a total of one hour per day and for 30 minutes at a time; sit for a total of one hour per day and for 45 minutes at a time; occasionally balance, crawl, reach, handle, finger and feel; never climb, stoop, kneel, or crouch; and needs a rest period every 15 minutes "all day long." When asked to describe the clinical and laboratory findings and symptoms

or allegations on which the limitations are based, Dr. Zengotita wrote, "office visits, chronic back pain/fibromyalgia, generalized anxiety, PTSD."

On November 10, 2010, plaintiff saw Dr. Zengotita for a follow up (Tr. at 871-879). "Scheduled to see psychiatrist for disability determination on 11/27. Still dreaming with Death. Now wakes up at 2 am and does not go back to sleep. Anxiety has good days and bad days." Dr. Zengotita diagnosed fibromyalgia, asthma, generalized anxiety disorder, hypertension, manic depression, myalgia, narcotic dependence, and severe major depression without psychotic features. He "continue[d] present treatment" and prescribed Xanax (anti-anxiety), Percocet (narcotic), Mobic (non-steroidal anti-inflammatory), Seroquel (anti-psychotic), Albuterol (inhaler), Mirapex (treats restless leg syndrome), Prilosec (reduces stomach acid), Pravachol (lowers cholesterol), Lidocaine patch (for pain), Zestoretic (also called hydrochlorothiazide, treats high blood pressure), Patanol (eye drops), Soma (muscle relaxer), Spiriva (for asthma), and Flonase (steroid nasal spray). All of these medications had refills of three to eight months except the Percocet.

On February 10, 2011, plaintiff saw Dr. Zengotita (Tr. at 1006-1013). Plaintiff had started seeing a psychiatrist, Dr. Saba, at the Clark Center. He started her on Trazodone (treats depression and anxiety) which helped her sleep better. She reported that her anxiety was worse in the morning. Dr. Zengotita assessed fibromyalgia, manic depression, severe major depression without psychotic features, peptic ulcer disease, hypertension and asthma. He refilled her medications, added Avelox for bronchitis, and told her to stop smoking.

On May 12, 2011, plaintiff saw Dr. Zengotita (Tr. at 995-1004).  Plaintiff was continuing to see Dr. Saba (psychiatrist) who had increased plaintiff's dose of Seroquel (antipsychotic), increased her dose of Trazodone (treats depression and anxiety), and had added Citalopram (antidepressant).  Plaintiff complained that her pain was not controlled.  Percocet (narcotic) was not helping.  She was not sleeping well.  She was still smoking.  Dr. Zengotita prescribed OxyContin, a narcotic, along with various other medications including Percocet, Soma (muscle relaxer), and Xanax (anti-anxiety).

On May 17, 2011, plaintiff testified at the administrative hearing.  She stated at that time that she was only taking two medications:  Citalopram (antidepressant) and OxyContin (narcotic).  However, just five days earlier, medical records show that she was taking Seroquel (an anti-psychotic), Trazodone (treats depression and anxiety), Percocet (narcotic), Soma (muscle relaxer), Xanax (anti-anxiety), and various other medications for asthma, hypertension, etc.

On June 16, 2011, plaintiff saw Dr. Zengotita (Tr. at 987-994).  Plaintiff continued to see Dr. Saba, a psychiatrist.  She reported having good days and bad days, said she was having chronic pain and her OxyContin was not lasting all day.  She was still smoking but was down to 1/2 pack per day.  Dr. Zengotita doubled plaintiff's dose of OxyContin (narcotic).

On September 29, 2011, plaintiff saw Dr. Zengotita for a follow up on carpal tunnel surgery (Tr. at 975-985).  "Got denied for disability.  Continues to see Dr. Saba (psychiatrist).  Chronic pain.  States there are days she is in 'agony'.  OxyContin BID [twice a day].  States it is helping.  Current pain level 4/10.  Still smoking."  Dr. Zengotita

diagnosed fibromyalgia, asthma, generalized anxiety disorder, hypertension, manic depression, myalgia, narcotic dependence, and severe major depression without psychotic features.  He prescribed OxyContin (narcotic), Zestoretic (for hypertension), Patanol (for allergies), Mobil (non-steroidal anti-inflammatory), Xanax (for anxiety), hydrochlorothiazide (for hypertension), Advair (for asthma), Soma (muscle relaxer), Mirapex (for restless leg syndrome), Spiriva (for asthma), Lipitor (for high cholesterol), Proventil (for asthma), Prilosec (reduces stomach acid), Lidocaine patches (for pain), and Flonase (steroid nasal spray).  All of these except the narcotic had refills.  Dr. Zengotita recommended that plaintiff stop smoking.

On January 4, 2012, plaintiff saw Dr. Zengotita for a follow up (Tr. at 1049-1058). Plaintiff reported headaches and chronic pain.  "Feels she is hurting worse."  Plaintiff described her current pain level as an 8/10.  Dr. Zengotita prescribed Toradol for headache and increased plaintiff's OxyContin (narcotic) dosage.

On January 6, 2012, plaintiff saw Dr. Zengotita (Tr. at 1039-1046).  She complained of daily throbbing headaches for the past three weeks.  She had tried all over-the-counter medications without relief.  Dr. Zengotita prescribed steroids and antibiotics.

On April 4, 2012, plaintiff saw Dr. Zengotita (Tr. at 1027-1038).  She complained of feeling tired all the time and cold all the time.  Her thyroid tests were normal.  She complained of chronic ongoing pain which she described as a 7 or 8 out of 10.  Her neck was hurting the worst.  Dr. Zengotita ordered a lipid panel and liver function tests,

and he arranged for an overnight pulse oximetry test. He continued her same medications.

On April 26, 2012, plaintiff saw Dr. Zengotita (Tr. at 1016-1027). Plaintiff reported that she was still seeing Dr. Saba and was still participating in counseling. She complained of "bad headaches". She said she had fallen off the stool in the bathroom twice. She said it feels like her head is going to rupture and her eyes are going to pop out of her head. Her headaches were occurring daily. She also reported chronic pain despite taking OxyContin (narcotic) 40 mg twice a day. Due to her complaints of chronic malaise and fatigue, he referred her for a sleep study. He prescribed Topamax for headaches.

## V. FINDINGS OF THE ALJ

Administrative Law Judge David Fromme entered his opinion on August 25, 2011 (Tr. at 16-30). Plaintiff's last insured date was June 30, 2013 (Tr. at 16, 18).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date of January 1, 2006 (Tr. at 18). She had earned income in 2006, 2007, and 2008 but her earnings did not amount to substantial gainful activity (Tr. at 18). Plaintiff continued to work with reduced hours and more breaks, but she became unable to work at all on September 1, 2008 (Tr. at 19).

Step two. Plaintiff has the following severe impairments: fibromyalgia, depression, anxiety, post traumatic stress disorder, degenerative joint disease of the knee, hypertension, personality disorder not otherwise specified, and narcotics and/or

benzodiazepine dependence (Tr. at 18).  In finding that these impairments are severe, the ALJ noted that he gave plaintiff the benefit of the doubt (Tr. at 21).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 21-23).

Step four.  Plaintiff has the residual functional capacity to perform light work (stand and walk for six hours per day, sit for six hours per day, lift and carry 20 pounds occasionally and 10 pounds frequently) except that she can only occasionally push or pull, bend, stoop, crouch, squat, kneel or crawl; she should avoid any exposure to unprotected heights, hazards, extreme temperature, humidity, dust, fumes, pollen or poor ventilation; she should have no close personal interaction with coworkers; she should have no personal interaction with the public; she can pay attention well enough to sustain a simple routine and/or repetitive tasks; she cannot sustain a high level of concentration such as sustained precision and/or attention to detail; she cannot tolerate high stress and should not have a job requiring fast paced activities, strict and explicit production quotas, deadlines, and/or schedules, or unusual changes in work settings (Tr. at 23).  With this RFC, plaintiff is unable to perform any of her past relevant work -- cashier II, waitress, delivery driver, and home attendant (Tr. at 28-29).

Step five.  Plaintiff can perform other work available in significant numbers in the national economy such as housekeeping cleaner or office helper (Tr. at 29-30). Therefore, was found not disabled (Tr. at 30).

## VI.  OPINION OF TREATING PHYSICIAN JAIME ZENGOTITA

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of plaintiff's treating physician, Jaime Zengotita.  Dr. Zengotita rendered his opinion on October 6, 2010, in a Medical Source Statement Physical in which he found that plaintiff could lift and carry five pounds frequently and ten pounds occasionally; stand or walk for a total of one hour per day and for 30 minutes at a time; sit for a total of one hour per day and for 45 minutes at a time; occasionally balance, crawl, reach, handle, finger and feel; never climb, stoop, kneel, or crouch; and needs a rest period every 15 minutes "all day long."

The ALJ had this to say about Dr. Zengotita:[4]

This suggestion that claimant is unable to stand, walk and sit for more than a total fo 2 hours daily, is unsupported, unexplained and contrary to the other evidence of record. Dr. Zengotita's own reports . . . fail to reveal the type of significant clinical and laboratory abnormalities such as motor weakness and atrophy that one would expect if the claimant were in fact bedridden or reclining all but 2 hours daily.

What is noteworthy about Dr. Zengotita's records is that claimant's complaints of muscle tenderness and discomfort are present while she was working, and continue routinely to the present, varying with her reported level of stress and her mental and emotional condition. Throughout, when Dr. Zengotita reports a physical examination, he records normal range of motion, muscle strength, and neurological signs. . . .  The absence of any evidence showing a significant degree of muscle atrophy, paravertebral muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or reduced range of motion of the spine or joints, tends to indication [sic] that claimant continues to move about on a fairly regular basis.

(Tr. at 26).

---

[4]The ALJ misspelled Dr. Zengotita's name multiple times in the order, but for ease of reading I will not include the "sic" notation after each.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

Here, the ALJ failed to give controlling weight to the opinion of Dr. Zengotita and also failed to discuss any of the factors enumerated in 20 C.F.R. §§ 404.1527 and 416.927. He merely found that the record did not show muscle atrophy, paravertebral muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or reduced range of motion of the spine or joints. However, muscle spasms were noted on exam in 2006, 2007 and 2008. Gait disturbance was noted on at least two occasions in Dr. Zengotita's records. Decreased range of motion in her lumbar spine was noted in 2009.

Defendant argues that the ALJ's decision to discredit this opinion is supported by the record because on September 18, 2008, Dr. Zengotita noted that plaintiff appeared well and was in no apparent distress and he "repeatedly noted that Plaintiff was doing very well, sleeping well, and had a stable mood." However, as is evident by the summary of Dr. Zengotita's records above, this only describes a sprinkling of the medical visits. Significantly, plaintiff was assessed with manic depression. The records show, over a period of years, that she sometimes was crying and agitated during her medical visits and other times was in no distress and was described as pleasant and cooperative. On some visits plaintiff described her medication therapy as working well, and then a short time later would complain that her medicine was not working. Dr. Zengotita's records show that plaintiff was on a large number of prescription medications for various conditions, yet she testified at her hearing inaccurately that she was only taking two medications. The record clearly shows that Dr. Zengotita regularly increased plaintiff's pain medication and his records reflect that once plaintiff started seeing a psychiatrist who prescribed her antipsychotic, that medication and antidepressants were continually being adjusted.

It may very well be that Dr. Zengotita's opinion is not entitled to controlling weight. However, here, the ALJ failed to address the factors as required by the regulations, and the one paragraph he dedicated to assessing Dr. Zengotita's opinion misstates the record.

## VIII.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's opinion.  Therefore, it is

ORDERED that the decision of the Commissioner is reversed and this case is remanded to the Commissioner for reconsideration in accordance with the regulations.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 16, 2014